**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BRIAN K. BROOKINS, II, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17 C 06708 |
| | ) | |
| ANDREW MARSHALL SAUL, | ) | Judge John J. Tharp, Jr. |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Pursuant to 42 U.S.C. § 405(g), Brian Brookins, II asks this Court to review the Commissioner of Social Security's determination that he is not disabled within the meaning of the Social Security Act. Because the Court finds that the Administrative Law Judge's ("ALJ") assessment of Mr. Brookins' impairments—narcolepsy, sleep apnea, and depression chief among them—was supported by substantial evidence, Mr. Brookins' request for reversal is denied and the Commissioner's cross-motion for summary judgment is granted.

**BACKGROUND**

Mr. Brookins applied for disability insurance benefits and supplemental security income on January 16, 2014, alleging a disability beginning in August 2012. Administrative Record ("AR") 18, ECF No. 8-1. The claims were initially denied on May 27, 2014, and again upon reconsideration on March 19, 2015. *Id.* Mr. Brookins requested a hearing before an ALJ, which he received. The video hearing was held on September 8, 2016 and on March 9, 2017, the ALJ issued an opinion finding that Mr. Brookins was not disabled. *Id.* at 27. After the Appeals Council declined Mr. Brookins' request for review—making the ALJ's decision the final decision of the Commissioner, *see Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019)—Mr. Brookins filed

this lawsuit seeking judicial review of the ALJ's decision.

## I. Relevant Evidence

Mr. Brookins seeks review of the ALJ's decision regarding his narcolepsy, sleep apnea, and depression. The administrative record contains the following evidence that bears on his claims:

### A. Relevant Evidence from Mr. Brookins' Treating Physicians

In 2009, Mr. Brookins was diagnosed with sleep apnea and narcolepsy. Although there is no sleep study in the record, Mr. Brookins testified to having taken one in 2009, AR 60, and various treatment notes reference a study performed around that time. *See, e.g., id.* at 405. Following his diagnoses and the sleep study, Mr. Brookins began using a CPAP machine or a BiPAP machine (the record alternately refers to both) to help him sleep through the night and was prescribed Provigil.[1] *Id.* In February 2012, after an asthma flare up, Mr. Brookins established care with Advocate Medical Group (AMG). *Id.* at 368. At his first visit, Mr. Brookins saw Dr. Howard Becker and primarily complained of a history of asthma and allergies, though his intake forms also indicate sleep apnea and narcolepsy as additional health issues. *Id.* at 368, 370.

Over the remainder of 2012, Mr. Brookins visited AMG every few months and reported ongoing, and escalating, difficulties with narcolepsy and sleep apnea, as well as feelings of depression.[2] First, in June 2012, Mr. Brookins returned to Dr. Becker for his annual checkup and reported problems with sleepiness despite being on BiPAP nightly and taking the maximum dosage of Provigil. *Id.* at 357. Dr. Becker advised Mr. Brookins to see a sleep doctor to ensure that he was receiving adequate treatment for his sleep apnea. *Id.* at 359. Mr. Brookins also reported feeling

---

[1] Provigil is used to reduce extreme sleepiness due to sleep disorders. Modafinil is the generic name for Provigil.

[2] Mr. Brookins also returned to AMG for difficulties related to his asthma and chest tightness, but the Mr. Brookins does not raise arguments for review related to those medical issues.

depressed, though Dr. Becker tentatively attributed those feelings to the stress of caring for his five children and stated that, if the feelings continued, they could try an antidepressant. *Id.* Mr. Brookins next visited Dr. Becker in August and reported that he had begun falling asleep randomly for short periods and that he was continuing to struggle with feelings of depression. *Id.* at 354. Dr. Becker added a prescription for Wellbutrin[3] and planned for Mr. Brookins to consult with a neurologist. *Id.* at 356. Mr. Brookins returned for a follow-up in October with no major changes: his medications were unchanged, and he was still having issues with his narcolepsy. *Id.* at 351. Dr. Becker noted that Mr. Brookins had not been to see a neurologist and/or a psychiatrist and reiterated his suggestion. *Id.* Mr. Brookins also reported that he was no longer employed, that he was applying for disability, and that he was moving to the south side of Chicago and would need to find a new doctor in the area. *Id.* The treatment notes indicate that Mr. Brookins gave Dr. Becker disability forms to fill out, but those forms are not in the record. *Id.* at 353. Two months later, in December 2012, Mr. Brookins returned to AMG for a final time before his move, though he did not see Dr. Becker. Again, his symptoms were largely unchanged: he reported struggling with depression and narcoleptic episodes. *Id.* at 348. As part of the treatment plan, Mr. Brookins was again referred to psychiatry. *Id.*

The next treatment note in the record comes over a year later, in March 2014, when Mr. Brookins established care with a new doctor, Dr. Michael Liston. *Id.* at 398. At this visit, Mr. Brookins reported that he had been switching doctors frequently and that he had recently run out of his medications, though he had continued to use a CPAP machine nightly. *Id.* Mr. Brookins also noted frequent migraine headaches, which he believed may be related to his sleep apnea and narcolepsy. *Id.* Dr. Liston refilled Mr. Brookins medications and told him to return in one month.

---

[3] Wellbutrin is an antidepressant. Bupropion is the generic name for Wellbutrin.

3

As instructed, Mr. Brookins returned in April and reported that his narcolepsy was well-controlled on the Modafinil, though he noted an increase in secretions around his mouth when using the CPAP machine. *Id.* at 394. Dr. Liston refilled the Modafinil and noted that he would like to see Mr. Brookins' sleep study. *Id.* at 396.

At Mr. Brookins' next (and final) visit to Dr. Liston, in September 2014, they discussed his disability application. Mr. Brookins presented Dr. Liston with various forms, but Dr. Liston said that he could not fill out the pulmonary function testing form or the psychiatry form and that he could complete only part of the functional capacity exam. *Id.* at 430. Dr. Liston encouraged Mr. Brookins to follow up with the relevant experts in psychiatry and pulmonology for "further disability determination" regarding his depression, narcolepsy, and asthma. *Id.* In the functional capacity exam, Dr. Liston noted Mr. Brookins' primary symptom was feeling "tired/fatigued." *Id.* at 433. He noted that Mr. Brookins' depression contributed to the severity of the symptoms and functional limitations. He indicated, however, that these symptoms were "never" severe enough to interfere with Mr. Brookins' "attention and concentration." *Id.* at 434. In response to a question about the degree to which the patient can "tolerate work stress," Dr. Liston marked "incapable of even 'low stress' jobs." *Id.* at 435. By way of explanation, Dr. Liston offered, in quotation marks, what appear to be statements from Mr. Brookins: "because I cannot do easy stuff"; "I cannot work for longer than 2 hours." *Id.* Aside from finding that Mr. Brookins could lift up to 50 pounds, *Id.* at 437, Dr. Liston skipped the exertional questions and concluded the form by noting that there were no other limitations that would affect Mr. Brookins' ability to work at a regular job on a sustained basis. *Id.* at 438.

In May 2015, Mr. Brookins reestablished care with AMG and was treated by Dr. Becker for the first time since October 2012. *Id.* at 465. Dr. Becker noted that there were no major changes

4

in Mr. Brookins' medical history or medications and that Mr. Brookins was "still very sleepy with narcolepsy despite [M]odafinil." *Id.* Dr. Becker noted it was time to reassess Mr. Brookins' treatment plan and planned for Mr. Brookins to get a neurological consult to re-examine the sleep apnea, narcolepsy, and migraines. *Id.* at 468. Mr. Brookins returned in August 2015 without having consulted with a neurologist and reported no major changes. *Id.* at 461. At this appointment, Mr. Brookins largely complained of unrelated medical issues, though Dr. Becker once again noted that Mr. Brookins "needs to see sleep doctor" regarding his CPAP machine for "reassessment in so far as adjusting his mask and checking his pressure." *Id.* at 463.

Mr. Brookins visited an AMG neurologist twice in 2016—first in January, then again in May for a follow-up. At the first appointment, Mr. Brookins relayed his ongoing difficulties with narcolepsy, sleep apnea, and migraines and reported episodes of cataplexy (a sudden loss of muscle control often associated with narcolepsy). *Id.* at 486. The neurologist, Dr. Sirdar, reviewed Mr. Brookins' medical history and noted that he "suspect[ed] that weight gain has lead [sic] to poor sleep thus exacerbating" his headaches and fatigue. *Id.* at 489. Dr. Sirdar prescribed Topamax for the migraines, referred Mr. Brookins to sleep medicine and for a sleep study, and told him to return in two months. *Id.* Five months later, in May 2016, Mr. Brookins returned and reported that his headaches were "much improved," but that he continued to struggle with his sleep and had suffered multiple episodes of cataplexy. *Id.* at 481. Dr. Sirdar recommended numerous lifestyle changes to help with the headaches and the fatigue and again noted that he would refer Mr. Brookins to sleep medicine for a sleep study. *Id.*

The last treatment evidence in the record is Mr. Brookins' August 2016 visit to Dr. Becker. Dr. Becker noted no major changes and refilled Mr. Brookins' prescriptions. *Id.* at 443. He also noted that Mr. Brookins still needed to see a sleep doctor. *Id.*

### B. Evidence from State Agency Consultants

Mr. Brookins underwent two examinations by state agency consultants on May 12, 2014. First, Mr. Brookins saw Dr. Youkhana for an internal medicine consultative examination. *Id.* at 405. Mr. Brookins reported his difficulties with narcolepsy and sleep apnea and noted that he no longer drove his car, instead relying on his mother. *Id.* Dr. Youkhana's notes also indicate that Mr. Brookins stated he felt stable on his depression medication. *Id.* at 406. That same day, Mr. Brookins also saw Dr. Karamitis for a mental status evaluation. *Id.* at 420. Dr. Karamitis evaluated Mr. Brookins' mood and affect as "cooperative and self-disclosing," and noted that he "provided his medical history with no apparent cognitive difficulties in a clear, concise and coherent manner." *Id.* at 422. As to Mr. Brookins' "thought process," Dr. Karamitis found: "Psychomotor status was retarded. His cognitive processes were clear, coherent, relevant, and goal directed." *Id.* Mr. Brookins also completed various recall and calculation tests for Dr. Karamitis. *Id.* Dr. Karamitis concluded that Mr. Brookins—who earned a high school diploma and spent some time at community college and in trade school—had a mental status "somewhat consistent with his level of education, but also compromised by the difficulties that currently have a hold on him." *Id.* at 423.

### C. Evidence from Mr. Brookins' Testimony

Mr. Brookins testified that he last worked as a service technician repairing vending machines for Coca-Cola in August 2012. *Id.* at 41, 43. He was diagnosed with sleep apnea and narcolepsy in 2009 but, at first, it manifested only by causing him to fall asleep in meetings. *Id.* at 47. This didn't prove to be a problem with his employer because he was a good worker. *Id.* at 48. Eventually, though, his performance at work started to decline due to his problems with sleep apnea and narcolepsy. *Id.* at 46. He began arriving late to work and had difficulty keeping up with

his duties. *Id.* He obtained a doctor's note explaining the situation and his manager allowed him to keep working part time—he would "work for like an hour or two" and then the manager would "let [him] go home." *Id.* at 48. At a certain point, he even struggled to complete these two-hour shifts. *Id.* at 48. The accommodations were ultimately unsustainable—Mr. Brookins was supposed to be working full-time—and he left the company. *Id.* After he left Coca-Cola (August 2012), Mr. Brookins did not look for work—he stated that his doctor wanted him to focus on improving his health before returning to work. *Id.*[4]

At the time of the hearing, Mr. Brookins testified that he takes naps "five to six" times a day. *Id.* at 53. He has episodes of cataplexy where he randomly falls asleep "probably a couple times a month." *Id.* He has never hurt himself seriously during one of these episodes, though he does have scars on his body from falls. *Id.* To take care of himself and his five children, Mr. Brookins, who is currently divorced, gets a lot of help from his mother. *Id.* at 49, 478. She lets Mr. Brookins stay in a house that she owns, and she comes by almost every day to make sure that he is "living okay." *Id.* His kids also help with housework and chores—especially his oldest daughter (age 18). *Id.* Mr. Brookins takes the Modafinil every morning—if he doesn't, he lacks the energy to perform even the simple household tasks that he normally performs. *Id.* After taking his medication, Mr. Brookins will sometimes have a "spurt of energy" during which he will try his "hardest to get as much done as possible around [his] house." *Id.* at 50. With the help of his oldest daughter, he will get his kids ready for school. With the younger children off to school, he will try to accomplish as much cleaning as possible (again with his oldest daughter's help). *Id.* After that, he generally needs to sleep for about an hour. *Id.* Following his nap, he will try to prepare for the

---

[4] Mr. Brookins' treatment records at AMG do not reflect that Dr. Becker or any other physician at AMG provided this advice.

kids' return from school and be ready to retrieve them from the bus stop. *Id.* at 51. Mr. Brookins also helps with schoolwork—though he can only help in 15 or 20-minute increments before he needs to nap for 15-20 minutes. *Id.* at 52. After three or four iterations of that process, the schoolwork is generally complete. *Id.* With schoolwork complete, the family prepares dinner. *Id.* After dinner, Mr. Brookins generally spends some time with his kids before putting them to bed. *Id.*

## II. The Evaluation Process and the ALJ's Decision

A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To determine whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?

2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?

3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?

4. Is the claimant unable to perform his or her former occupation?

5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520. "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

In the present case, the ALJ followed the required five-step sequential process in assessing

8

Mr. Brookins' claims. *See* 20 C.F.R. § 404.1520(a). At Step 1, the ALJ found that Mr. Brookins

had not engaged in substantially gainful activity since August 1, 2012. AR 20. ECF No 8-1. At

Step 2, the ALJ determined: (1) that Mr. Brookins' hypertension, asthma, and narcolepsy were

severe impairments; (2) that Mr. Brookins' depressive disorder was a non-severe impairment. *Id.*

at 20-21. In assessing Mr. Brookins' mental impairments, the ALJ found that Mr. Brookins had

mild limitations in "understanding, remembering, or applying information" and "concentration,

persistence, or pace." *Id.* at 21. At Step 3, the ALJ determined that Mr. Brookins did not have an

impairment or combination of impairments that met or medically equaled the severity of any of

the listings enumerated in the regulations. *Id.* at 22. In reaching that conclusion, the ALJ assessed

Mr. Brookins' sleep apnea and narcolepsy under Listing 12.04—the listing for affective disorders

including sleep disturbance—because his primary complaint was fatigue. *Id.* Because none of the

mental limitations found at Step 2 were "marked," however, the ALJ found that the fatigue

impairments were not of listing-level severity. *Id.* The ALJ then assessed Mr. Brookins' Residual

Functional Capacity (RFC)[5] and determined that Mr. Brookins has the RFC to "perform medium

work as defined in 20 CFR 404.1567(b) and 416.967(c)" subject to the following limitations: he

can never "climb ladders, ropes, or scaffolds," he is "limited to no working around unprotected

heights, open flames, or danger and/or moving machinery," and he "should avoid concentrated

exposure to dusts, fumes, gases, and poor ventilation." *Id.* at 22-23. At Step 4, the ALJ determined

that Mr. Brookins "is capable of performing past relevant work as a vending machine repairer."

*Id.* at 27. As a result, the ALJ found that Mr. Brookins "has not been under a disability, as defined

in the Social Security Act, from August 1, 2012, through the date of this decision." *Id.*

---

[5] Between Step 3 and Step 4, the ALJ must assess a claimant's RFC. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008).

**DISCUSSION**

Section 405 of the Social Security Act authorizes judicial review of the Commissioner's final decision regarding a claimant's disability status. *See* 42 U.S.C. § 405(g). But a Court reviewing the Commissioner's final decision may not assess anew whether the claimant is disabled, nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Rather, the Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In addition to relying on substantial evidence, "the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). In other words, the ALJ must "identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

Mr. Brookins argues that the ALJ made several reversible errors: first, that the ALJ failed to properly account for his mental deficiencies; second, that the ALJ's assessment of his alleged symptoms was premised upon impermissible inferences and cherry-picking; and third, that the ALJ did not properly explain or support the assessment of the medical and lay opinion evidence. Because the Court finds that Mr. Brookins has identified no reversible error in the ALJ's opinion,

the motion to remand is denied and the ALJ's decision is affirmed.

## I. Paragraph B Findings and Non-exertional Limitations

Mr. Brookins argues that the ALJ erred in assessing his mental impairments at Step 2 and Step 3, and, most consequentially, in the RFC assessment. Much of the dispute comes down to a contention that the ALJ misinterpreted the functional capacity exam completed by Dr. Liston and, based on that misinterpretation, reached improper conclusions at each step. More generally, however, Mr. Brookins also argues that the RFC assessment failed to appropriately incorporate his non-exertional deficiencies. The Court takes up the threshold question of interpretation first.

Mr. Brookins contends that the ALJ misconstrued Dr. Liston's statement that "pain or other symptoms" never interfere with his attention and concentration. According to Mr. Brookins, Dr. Liston's statement must be read to exclude the effects of fatigue and depression because Dr. Liston, having already acknowledged those symptoms, wouldn't have included them under "other symptoms." Mr. Brookins' interpretation may be plausible, but it is hardly self-evident. Indeed, the ALJ's reading is the most straight-forward understanding of the text: the question asks about the impact of "pain or other symptoms" without qualification. As a result, Mr. Brookins' contention is without merit: the ALJ's reading is, at the very least, a reasonable one and it is not the Court's role to second guess the ALJ's reasonable interpretations of the record.

Furthermore, even if Dr. Liston's answer is assumed to exclude fatigue and depression, the exam—read as a whole—does not provide evidence of non-exertional deficiencies. The last question of the exam provided Dr. Liston an opportunity to explain "any other limitations" that would affect Mr. Brookins' "ability to work at a regular job on a sustained basis." AR 438, ECF No. 8-1. If Dr. Liston had consciously excluded problems with fatigue or depression in his prior answer, he should have elaborated on any limitations associated with those symptoms in this catch-

all question; instead, he responded "none." *Id.* Ignoring this response, Mr. Brookins points to Dr. Liston's answer that Mr. Brookins was incapable of tolerating even low-stress jobs. To explain that answer, however, Dr. Liston provided what appear to be quotes from Mr. Brookins. "And medical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). As a result, neither that answer nor any other in the exam can be read to provide reliable evidence of a deficiency in concentration, persistence, or pace. Viewed this way, Mr. Brookins' argument amounts to a claim that Dr. Liston erred in filling out the form. If so, it was Mr. Brookins' responsibility—or that of his attorney—to correct any errors or misleading answers and thereby "ma[ke] his best case before the ALJ." *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007) ("[A] claimant represented by counsel is presumed to have made his best case before the ALJ.").

Because the ALJ properly interpreted Dr. Liston's functional capacity exam, it follows that the conclusions based on that interpretation were not erroneous. First, at Step 2, the ALJ referred to Dr. Liston's findings in assessing the severity of Mr. Brookins' mental impairments. To determine the severity of a claimant's mental impairment, the ALJ must rate the degree of functional limitation in four areas (known as the "paragraph B" criteria): (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentration, persistence, or pace; and (4) adapting or managing oneself. SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996). In the present case, the ALJ found that Mr. Brookins had mild limitations in "understanding, remembering, or applying information" and "concentration, persistence, or pace," and no limitations in the other two areas. AR 21, ECF No. 8-1. Next, at Step 3, the ALJ used these same paragraph B findings to determine that Mr. Brookins' sleep apnea and narcolepsy did not medically

equal the severity of one of the listed impairments. *See id.* at 22 (assessing Mr. Brookins' fatigue under listing 12.04 and noting that "there is no evidence of marked limitations, as discussed above"). Because these findings relied on a permissible interpretation of Dr. Liston's exam, they were supported by substantial evidence.

Mr. Brookins also argues that the "real harm" occurred in the RFC assessment, where the ALJ "failed to mention the paragraph B criteria again" or otherwise explain why the previous finding regarding mild impairments did not require accommodation. Pl.'s Mot. Summ. J. 10, ECF No. 11. Mr. Brookins is correct that, when determining a claimant's RFC, an ALJ must "consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment." *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010). As relevant here, "[t]his includes any deficiencies the claimant may have in concentration, persistence, or pace." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). Furthermore, while a paragraph B limitation is not an RFC finding, SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996), numerous courts in this district have found that, where an ALJ finds mild limitations at Step 2 or Step 3, she must include (or explain her reasons for excluding) those limitations in the RFC assessment. *See Judy D. v. Saul*, No. 17 C 8994, 2019 WL 3805592, at *5 (N.D. Ill. Aug. 13, 2019) ("[T]he ALJ expressly found that [the plaintiff] suffered a mild limitation in [concentration, persistence, and pace]. Once he made this finding, he was required to discuss how or why this limitation factored (or did not factor) into his RFC assessment."); *Muzzarelli v. Astrue*, No. 10 C 7570, 2011 WL 5873793, at *23(N.D. Ill. Nov. 18, 2011) ("If the ALJ believed that the mild limitations in [concentrating] did not merit a non-exertional limitation in the RFC, he was obligated to explain that conclusion so that we can follow the basis of his reasoning.").

Contrary to Mr. Brookins' assertion, however, the ALJ considered the combination of all

13

severe and non-severe impairments and adequately explained the absence of non-exertional limitations in the RFC assessment. Although the ALJ did not directly reference her prior paragraph B finding, she did discuss the relevant record evidence: the state consultative evaluation, Dr. Liston's functional capacity exam, Mr. Brookins' reported symptoms, and the state agency physicians' prior determinations. AR 24-27, ECF No. 8-1. And the ALJ explained why she did not find a non-exertional limitation: in reaching her conclusion regarding functional limitations, the ALJ gave "great weight" to both the state agency physicians and Dr. Liston, neither of whom recommended non-exertional limitations. The state agency physicians "opined that the claimant is limited to a range of medium exertional work" but did not include any non-exertional limitations despite finding paragraph B limitations. *Id.* at 27, 67-70. As the ALJ noted, this conclusion was consistent with Dr. Liston's opinion that, aside from a restriction on lifting over 50 pounds, Mr. Brookins "had no other limitations that would affect his ability to work at a regular job on a sustained basis, and that he would never experience pain or other symptoms severe enough to interfere with attention and concentration." *Id.* at 27. Although the ALJ might have drafted a clearer decision by directly referring to the paragraph B findings in reaching her conclusion, her assessment of the relevant evidence provides a "logical bridge" between the paragraph B limitations and the RFC finding lacking any coordinate limitations.

The Court is especially reluctant to nitpick the ALJ's explanation where, as here, no doctor recommended a non-exertional limitation. "There is no error when there is 'no doctor's opinion contained in the record [that] indicated greater limitations than those found by the ALJ.'" *Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018) (quoting *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)). In other words, there were no mental limitations supported by the medical record. As a result, the ALJ's decision to forgo a non-exertional limitation in this case was perfectly consistent

with the Seventh Circuit's (oft repeated) holding that documented mental limitations must be included in both the RFC finding and the hypothetical posed to the vocational expert. *Yurt*, 758 F.3d at 857 ("As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record."); *see also Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) (citing *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987) ("All that is required is that the hypothetical question [to the VE] be supported by the medical evidence in the record.")).

In sum, the ALJ adequately assessed Mr. Brookins' non-exertional limitations and her decisions were supported by substantial evidence at every step.

## II. Assessment of Subjective Symptoms

Mr. Brookins also takes issue with the ALJ's finding that his self-reported symptoms are not consistent with the record and her resulting conclusion that he is not as limited as alleged. The regulations provide a two-step process for evaluating a claimant's symptoms. First, the ALJ determines if there is an underlying medically determinable physical or mental impairment that "could reasonably be expected to produce the individual's symptoms." SSR 16-3p, 2016 WL 1119029, at *2 (Mar. 16, 2016). If so, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.* In determining whether to credit a claimant's description of the symptoms, "the ALJ must consider factors imposed by regulation, *see* 20 C.F.R. § 404.1529(c), and must support his [ ] finding with evidence in the record." *Slayton v. Colvin*, 629 F. App'x 764, 769 (7th Cir. 2015). A reviewing court "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017); *see also Summers v. Berryhill*,

864 F.3d 523, 528 (7th Cir. 2017) ("We give the ALJ's credibility finding 'special deference' and will overturn it only if it is 'patently wrong.'" (quoting *Eichstadt v. Astrue*, 534 F.3d 663, 667-68 (7th Cir. 2008))).

In the present case, the ALJ followed the two-step process: first, the ALJ found that Mr. Brookins' impairments could reasonably be expected to produce his symptoms, AR 27, ECF No. 8-1; second, she found that that Mr. Brookins' statements concerning the intensity, persistence, and limiting effects of those symptoms "are not entirely consistent with the medical evidence and other evidence in the record." *Id.* To support her finding, the ALJ provided the following reasons: (1) treating physicians had recommended conservative (rather than aggressive) treatment; (2) a lack of objective evidence and consistently normal examination findings; (3) Mr. Brookins' activities of daily living; (4) Mr. Brookins' statement to Dr. Liston that his narcolepsy was well-controlled on Modafinil; (5) a failure to procure a new sleep study; (6) Dr. Liston's findings that Mr. Brookins had no functional limitations and that his prognosis was good. *Id.* The ALJ's reasoning incorporates references to specific evidence in the record and, because the Court finds that many of her cited bases for discounting Mr. Brookins' testimony are sound, the decision does not lack "explanation or support." *Cullinan*, 878 F.3d at 603.

First and foremost, the ALJ properly considered the conflict between Mr. Brookins' self-reported symptoms and Dr. Liston's findings. *See* 20 C.F.R. § 404.1529 (The ALJ will consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your medical sources or other persons about how your symptoms affect you."). And inconsistency with Dr. Liston's findings—the only treating physician to submit a functional examination—provides an especially sturdy basis for discounting self-

reported symptoms because "treating physicians' opinions regarding the nature and severity of a claimant's symptoms normally are given controlling weight when well-supported by medically acceptable clinical and diagnostic techniques." *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010). Having rejected Mr. Brookins' interpretation of Dr. Liston's exam above, the Court finds that the ALJ's reliance on her contrary interpretation was proper at this stage.

The ALJ's reliance on Mr. Brookins' lack of objective evidence and consistently normal examination findings was also proper. While the ALJ cannot deny disability "solely because the available objective medical evidence does not substantiate" the alleged symptoms, the ALJ may "consider the lack of objective evidence in rejecting a claimant's subjective complaints." *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009). Here, the relevant missing evidence at issue is a sleep study. *See* SSA Program Operations Manual System ("POMS"), DI 24580.005 Evaluation of Narcolepsy, https://secure.ssa.gov/apps10/poms.nsf/lnx/0424580005 (Sept. 26, 2016) ("There are no physical abnormalities in narcolepsy, and with the exception of sleep studies, laboratory studies will be normal."). Mr. Brookins argues that the absence of a study cannot provide a basis for discounting his symptoms because it is attributable to the ALJ's own failure to develop a "full and fair record." *See Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). But "this obligation is not limitless," *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014), and here the ALJ discussed the sleep study with Mr. Brookins (who claimed he had it at his house) and left the record open for its inclusion pending Mr. Brookins' attorney's decision to submit it. AR 47, ECF No. 8-1. As a result, the ALJ was entitled to assume that the sleep study was not part of Mr. Brookins' "best case" for disability and could reasonably draw a negative inference from its absence. *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017) (rejecting an argument that the ALJ failed to adequately develop the record and finding that represented claimant made "best case" for disability); *see also Halsell*

*v. Astrue*, 357 F. App'x 717, 723 (7th Cir. 2009) ("[T]he ALJ was permitted to assume that Halsell, who has always been represented by counsel, was making the strongest case for benefits, so it was not improper for her to draw a negative inference from the fact that no treating physician opined that Halsell is disabled.") (internal quotation omitted). The normal examination findings also provided a sound basis for the ALJ's determination: while the ALJ could not reasonably rely on normal examination findings to confirm (or contradict) Mr. Brookins' diagnosis, they are still relevant to the severity of his alleged symptoms (fatigue and sleepiness). For example, the fact that Dr. Becker's notes indicate that Mr. Brookins consistently appeared "alert and awake" upon examination provides a permissible basis for discounting his alleged symptoms. *See, e.g.,* AR 445, 449, 455, 460. As a result, the ALJ's reliance on these factors was proper.

Furthermore, the ALJ's decision indicates that the absence of a new sleep study is relevant for an entirely separate reason: Mr. Brookins' failure to undergo a new study despite "having one prescribed over one year ago." AR 26, ECF No. 8-1. An "ALJ may deem an individual's statements less credible if medical reports or records show that the individual is not following the treatment as prescribed." *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014), as amended (Aug. 20, 2014). And here, beginning in 2012, Mr. Brookins' treating physicians consistently encouraged him to return to a specialist so that he might reassess his sleep apnea and narcolepsy and potentially adjust his CPAP machine. *See, e.g.,* AR 351, 359. Nonetheless, it was not until 2016 that Mr. Brookins returned to a neurologist—and even then, the record indicates that he did not pursue the referral to a sleep doctor or undergo a new sleep study. *Id.* at 447. Furthermore, the ALJ's inquiries into Mr. Brookins' treatment did not uncover any reasons for his failure to follow through on this treatment plan; instead, Mr. Brookins made clear that he understood the potential benefits of reassessment for his sleep apnea. *Id.* at 60. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although

18

a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference.").

To be sure, some of the ALJ's cited reasons are unconvincing or unsound. For example, the ALJ's citation to, and brief discussion of, Mr. Brookins' activities of daily living is unpersuasive. *See Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir.2011) ("An ALJ may consider a claimant's daily activities when assessing credibility, but ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence."). The ALJ noted Mr. Brookins' daily activities but did not explain how those activities are inconsistent with his alleged symptoms—indeed, doing so may be impossible because Mr. Brookins described his daily routine only in the context of how explaining how his activities are limited by his symptoms. Further, to the extent that it refers to anything other than Mr. Brookins' failure to follow up with a specialist, the Court finds the ALJ's description of Mr. Brookins' treatment as "conservative" to be questionable: the records indicate that he was on the maximum dosage of Modafinil and used his CPAP machine nightly. Finally, Mr. Brookins is right to describe the ALJ's reliance on his one-time statement that his narcolepsy was "well-controlled" on Modafinil as cherry-picking. This single report exists among many others, most of which indicate that the Modafinil helped some, but not enough.

Nonetheless, "[n]ot all of the ALJ's reasons must be valid as long as enough of them are, and here the ALJ cited other sound reasons for disbelieving [Mr. Brookins]." *Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009) (internal citation omitted). Because there was adequate evidence and explanation to support the ALJ's assessment of Mr. Brookins' subjective symptoms, the determination was not patently wrong.

19

### III. Treatment of Opinion Evidence

Mr. Brookins' third, and final, ground for reversal—that the ALJ's assessment of the certain medical opinion and other opinion evidence is unexplained and unsupportable—is also unavailing. Mr. Brookins raises objections to the ALJ's treatment of three pieces of evidence: Dr. Liston's functional capacity exam; the state agency physicians' opinions; and a letter from Mr. Brookins' mother. In the argument against the ALJ's treatment of Dr. Liston's exam, Mr. Brookins re-treads ground already covered and, for the reasons stated above, the Court finds that the ALJ properly interpreted Dr. Liston's findings.

Second, Mr. Brookins argues that the ALJ should not have assigned great weight to the opinions of the state agency physicians and takes issue with the accommodations recommended by those physicians. Mr. Brookins does not provide any reason why reliance on these opinions was improper, except that they did not recommend the limitations that he desires. In the Court's view, the ALJ properly relied on these opinions, particularly because the opinions were "consistent with the opinion of the claimant's treating physician." AR 27, ECF No. 8-1. Mr. Brookins seeks additional, or at least different, accommodations, but he can point to no medical evidence supporting his view because "no doctor's opinion contained in the record [ ] indicated greater limitations than those found by the ALJ." *Rice*, 384 F.3d at 370.

Third, Mr. Brookins takes issue with the ALJ's treatment of the letter from his mother. The regulations require an ALJ to "consider all of the available evidence from [a claimant's] medical and nonmedical sources." 20 C.F.R. § 404.1529(c)(1); *see also* 20 C.F.R. § 404.1545(a)(3) (in assessing RFC, "[w]e will also consider descriptions and observations of your limitations from your impairments(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons."). And an ALJ "generally should explain

the weight given to opinions from [non-medical] sources." 20 C.F.R. § 404.1527(f)(2). In this case, the ALJ acknowledged the letter and properly explained why she gave it little weight: "most important" was the fact that Mr. Brookins' mother's testimony was "simply not consistent with the preponderance of the opinions and observations by medical doctors" for the "same reasons Mr. Brookins' testimony was inconsistent with the evidence." AR 26, ECF No. 8-1. Because the Court found that the ALJ's finding of inconsistency with respect to Mr. Brookins' testimony was adequately supported, it follows that the ALJ's reasoning is adequate here as well. Mr. Brookins does, however, accurately take aim at the other reasons provided by the ALJ—Mr. Brookins' mother's potential bias and her lack of medical expertise. *See Roque v. Colvin*, No. 15 C 392, 2016 WL 1161292, at *5 (N.D. Ill. Mar. 22, 2016) ("The ALJ's dismissal of Cutt's lay opinion solely because she was not a treating source and because of her personal relationship with Roque was error."). But the ALJ did not rely exclusively on Brookins' mothers' bias or lack of expertise, and where the "most important" factor in assigning weight—inconsistency with the medical record— was a sound one, the decision is supported by substantial evidence.

* * * * *

For the reasons stated above, Mr. Brookins' request for reversal is denied and the Commissioner's cross-motion for summary judgment is granted. The ALJ's decision is affirmed.

Date: July 29, 2020

John J. Tharp, Jr.
United States District Judge

21